Argued and submitted December 23, 2014, reversed and remanded July 7, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AARON HIRSCHMAN,
*Defendant-Appellant.*

Deschutes County Circuit Court
MI121020; A153610

379 P3d 616

Erik M. Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael A. Casper, Deputy Solicitor General, argued the cause for appellant. On the brief were Ellen F. Rosenblum,

Attorney General, Anna M. Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

**HADLOCK, C. J.**

Acting as a self-described "Internet troll," defendant posted an advertisement on Craigslist, stating that he would give $20 to a person who would bring the person's official ballot to defendant, let defendant complete it, then sign the person's own name and submit the ballot to an elections volunteer. It is undisputed that defendant did not intend to actually vote using another person's ballot. To the contrary, the state acknowledged that defendant's motives were "political shenanigans * * * on the Internet" and "entertainment." Nonetheless, the state charged defendant with knowingly violating ORS 260.715(9), which prohibits making an "offer to purchase, for money or other valuable consideration, any official ballot." The trial court convicted defendant after rejecting his arguments that ORS 260.715(9) unconstitutionally abridges expression and that his actions had not violated the statute.

On appeal, the parties dispute the meaning of certain terms used in ORS 260.715(9). They also disagree about whether the statute, as properly construed, violates various constitutional provisions, including Article I, section 8, of the Oregon Constitution. We conclude, as explained below, that defendant's actions violated ORS 260.715(9). That is, by making the Craigslist posting, defendant did "offer to purchase" a ballot, because his words communicated that he was proposing to acquire another person's ballot in exchange for money. However, we also conclude that the statutory prohibition on making an "offer to purchase" a ballot is facially unconstitutional because, by its terms, it criminalizes expression and is not wholly contained within a well-established historical exception to the protections of Article I, section 8. Accordingly, the trial court should have granted defendant's demurrer. Because it did not, we reverse and remand.

## FACTS

The facts are not in dispute. A few days before the 2010 general election, defendant posted on the Craigslist political forum website.[1] The posting stated,

---

[1] Craigslist is a website that contains forums where people may advertise their desire to buy or sell various items or services. It also has "community" forums, including one labeled "political."

**"Wanna make an easy $20 for voting? (Downtown Bend)**

"Are you interested in making a quick and easy $20? Meet us in the parking lot downtown near the drop off voting booth this weekend. All you need to do is bring your UNFILLED clean voting ballot and let us fill it out then you sign, and we hand it to the volunteer in the voting booth. Its [*sic*] that simple! Then you get $20. We'll be there all weekend through [T]uesday."

(Boldface in original.) Craigslist deleted the post within half an hour. Although the posting included a link allowing people to reply to defendant's message, he did not get any responses during the brief time the message was posted.

A Bend police officer investigated defendant's posting. He went to the ballot drop off site but did not see any suspicious activity. The Oregon Secretary of State's office then opened an investigation and referred the matter to Oregon Department of Justice Special Agent Todd Gray. Gray traced the posting to defendant. During defendant's subsequent interview with Gray and another agent, he was "compliant and cooperative." Gray testified that defendant seemed "shocked that what he had done had risen to the level to have two special agents from the Attorney General's Office interviewing him."

During the interview, defendant acknowledged that he had created the Craigslist posting. Defendant maintained, however, that he had not purchased or attempted to purchase official ballots. Instead, he contended that he "was basically making a mockery of the system, and more so than anything, playing around, goofing around on the Internet." Further, defendant stated, "There's a lot of vulgarity there, and then people's political opinions, and I felt like I needed to chime in."

## PROCEDURAL HISTORY

The state charged defendant by district attorney's information with knowingly offering to purchase official ballots in violation of ORS 260.715(9).[2] Defendant demurred

---

[2] ORS 260.715(9) states, in pertinent part:

"A person may not manufacture or knowingly use a fraudulent ballot return identification envelope or secrecy envelope or sell, offer to sell, purchase or *offer to purchase*, for money or other valuable consideration, any

to the information before trial, contending that ORS 260.715(9) facially violates the free speech protections of the state and federal constitutions. In arguing that ORS 260.715(9) violates Article I, section 8, of the Oregon Constitution, defendant asserted, among other things, that the statute directly regulates speech and is not wholly contained within a well-established historical exception to section 8's protections.

The trial court denied defendant's demurrer. Specifically, the court concluded, in part, "that ORS 260.715(9) is directed at harmful effects. * * * The statute is not directed at the content of speech; the statute prohibits conduct, specifically a type of commerce rather than speech itself." Additionally, the court concluded that the statute is not overbroad or unconstitutionally vague. In so deciding, the court accepted the state's definition of "offer" as being "a proposal to enter into a bargain wherein a ballot is exchanged for consideration," regardless of whether the person making the offer subjectively intended to complete the transaction.[3]

During a discussion of proposed jury instructions, the parties again debated the meaning of the word "offer." In that context, the trial court rejected defendant's argument that a communication qualifies as an "offer" only if the offeror "actually intend[s] to enter into the contract." To the contrary, the court reasoned that "offer" means "a proposal communicated by either words, conduct, or both that would reasonably lead the party to whom it is made to believe that the proposal is intended to create a contract, if accepted," without regard to the offeror's subjective intent.

---

official ballot, replacement ballot, ballot return identification envelope or secrecy envelope."

(Emphasis added.)

The district attorney's information included a single charge against defendant:

"The Defendant, on or about October 29, 2010, in Deschutes County, did unlawfully and knowingly offer to purchase for money an official ballot."

[3] During each stage of the proceeding, the demurrer, jury instructions, and trial, the case was heard by a different judge. At each stage, the participating judge articulated a slightly different definition of "offer." However, those articulated definitions reflect the same core meaning, and none of them included a requirement that the offeror intend to follow through with the transaction.

During the subsequent bench trial, the state stipulated that defendant's "motive" was "political shenanigans" and to be an "internet troll," "meaning a person who takes contrarian positions online in an effort to agitate others." The state also stipulated that there was no evidence that defendant actually tried to purchase an official ballot. Moreover, the state recognized that "people do post crazy political satirical things to the Internet, and they do so on the same page in which [defendant] posted this advertisement." Defendant testified at trial that he did not believe that a reasonable person would understand his post as making a serious offer to purchase a ballot. He also stated that, in hindsight, he wished his post had specified that it was satirical, but hedged: "obviously it's not a good joke if you put that at the end, because then you don't get the response."

After the state rested, defendant moved for judgment of acquittal, contending, in part, that he "did not *offer* to *purchase* an official ballot for money." (Emphasis in original.) In essence, defendant contended that he had not offered to "purchase" a ballot, but had offered money only for the privilege of completing the ballot. Additionally, defendant argued that he had not knowingly or intentionally made an "offer," because no reasonable person would believe that his post manifested an actual intent to purchase a ballot and because a person does not "offer" to purchase a ballot, as that term is used in ORS 260.715(9), unless the person intends to complete the transaction. The court denied defendant's motion. Defendant raised similar points, again unsuccessfully, during his closing argument. The court again rejected those arguments, found defendant guilty, and sentenced him to 12 months of bench probation.

Defendant appeals, renewing his challenges to the trial court's interpretation of "purchase" and "offer" and, alternatively, his challenges to the constitutionality of ORS 260.715(9). Specifically, defendant asserts that the trial court erred in three respects: (1) in disallowing defendant's demurrer, which challenged the facial constitutionality of ORS 260.715(9); (2) in permitting "the state to elect a theory of ORS 260.715(9) that interpreted 'offer' to have the same definition as the Uniform Civil Jury Instructions"; and (3) in

denying defendant's motion for judgment of acquittal, particularly referencing the court's interpretation of "purchase" and "offer." We begin our analysis by considering the statutory-interpretation issues raised in defendant's challenge to the denial of his motion for judgment of acquittal. *See State v. Rodriguez-Moreno*, 273 Or App 627, 633 n 6, 359 P3d 532 (2015), *rev den*, 358 Or 611 (2016) (courts generally address statutory arguments before constitutional arguments, and address state constitutional arguments before those based on the federal constitution). We then address defendant's contention that the trial court should have granted his demurrer.

## STANDARDS OF REVIEW

"We review the denial of a motion for judgment of acquittal to determine whether, 'after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *State v. Pedersen*, 242 Or App 305, 311, 255 P3d 556, *rev den*, 351 Or 254 (2011) (internal quotation marks omitted). However, when 'the dispute * * * centers on the meaning of the statute defining the offense, the issue is one of statutory construction,' which we review for legal error. *State v. Hunt*, 270 Or App 206, 210, 346 P3d 1285 (2015) (internal quotation marks omitted)."

*State v. Summers*, 277 Or App 412, 423, 371 P3d 1223 (2016). We review a trial court's denial of a demurrer for legal error. *State v. Woodall*, 259 Or App 67, 69, 313 P3d 298 (2013), *rev den*, 354 Or 735 (2014).

## ANALYSIS

A. *The Motion for Judgment of Acquittal*

Again, defendant was charged with knowingly violating ORS 260.715(9), which provides, in pertinent part: "A person may not * * * offer to purchase, for money or other valuable consideration, any official ballot * * *." Defendant first argues that he was entitled to a judgment of acquittal because his Craigslist posting did not offer to "purchase" a ballot. In defendant's view, to "purchase" a ballot means "to acquire or take ownership of" that tangible object. He contends that his posting suggested only that defendant

wanted to *use* another person's ballot, for a short period of time, by completing it and giving it back to that person, who would then sign the completed ballot. Such an action does not, according to defendant, amount to a "purchase."

The state acknowledges that the term "purchase" can, as defendant asserts, mean the acquisition of a tangible object. The state argues, however, that the term also encompasses the act of buying the intangible right to use an object.

We need not resolve the parties' disagreement about the extent to which the word "purchase," as used in ORS 260.715(9) may (or may not) extend to acquiring intangible rights to use a ballot or one of the other items listed. As the parties agree, the plain meaning of "purchase" includes the act of paying money to acquire an object. *See State v. Briney*, 345 Or 505, 511, 200 P3d 550 (2008) (courts give an undefined term of common usage a "plain, ordinary meaning").[4] Here, the evidence is sufficient to support a finding that defendant offered to make just that kind of purchase. Again, his Craigslist posting stated, in part:

> "Meet *us* in the parking lot downtown near the drop off voting booth this weekend. All you need to do is bring your UNFILLED clean voting ballot and let *us* fill it out then you sign, and *we* hand it to the volunteer in the voting booth. Its [*sic*] that simple! Then you get $20."

(Emphases added.) That posting proposed that an elector give defendant and some unknown other person ("us") a

---

[4] For example, *Webster's* defines the verb "purchase" as follows:

"to get into one's possession : GAIN, ACQUIRE * * * **b** : to acquire (real estate) by any means other than descent or inheritance **c** *archaic* : to obtain (as a license) from authority **d** : to obtain (as merchandise) by paying money or its equivalent : buy for a price * * * **e** : to obtain (something desired) by an outlay (as of labor, danger, sacrifice) * * * : WIN, EARN * * * **2** *obs* : to cause to occur : EFFECT, PROCURE **3 a** : to haul in or up with or as if with a mechanical devise or rope **b** : to apply to (as something to be moved or lifted) a device for obtaining a mechanical advantage : get a purchase upon or apply a purchase to; *also* : to move (as a cannon) by a purchase **4 a** : to serve as a ransom for **b** : to constitute the means or medium for buying (something) * * * **1 a** : to acquire wealth or property **b** : to make a purchase or purchases : BUY **2** *obs* : to exert oneself : expend effort toward some end[.]"

*Webster's Third New Int'l Dictionary* 1843-44 (unabridged ed 1993) (italics and boldface in the original).

ballot to fill out, that the elector then sign the ballot, and that defendant and his accomplice ("we") then hand in the ballot. Thus, the posting suggested that defendant wished to pay $20 to divest an elector of a ballot and acquire it himself, albeit for a short period of time, before he and an accomplice would hand it over to an elections volunteer. That acquisition of a tangible ballot in exchange for money would constitute a "purchase" within the plain meaning of that term, even though defendant stated that he planned to keep the ballot only temporarily. The trial court did not err by denying defendant's motion for judgment of acquittal to the extent it was based on defendant's contention that what he proposed was not a "purchase."

Defendant also contends that the state failed to prove that he made an "offer" at all. In his view, the phrase "offer to purchase," as that phrase is used in ORS 260.715(9), carries a requirement that the state prove that the offeror intend to follow through with the purchase. The state contends that "offer" carries its plain meaning and it therefore suggests that ORS 260.715(9) "prohibit[s] any statement that a reasonable person would understand to be a proposal to buy or sell a ballot." The state argues in its brief that giving the word "offer" that meaning—which does not require proof that the offeror intended to carry through with the purchase—reflects legislative intent "to prevent not only *realized* misconduct, but also the *enabling* of misconduct (such as the creation of a marketplace for ballots) as well as the public perception that election results are untrustworthy because ballots are for sale." (Emphases in original.)

Our analysis begins with the words of the statute itself. *See Bundy v. NuStar GP, LLC*, 277 Or App 785, 793, 373 P3d 1141 (2016) (in construing a statute, "we give primary weight to the text and context of the provision"). The term "offer" is not statutorily defined for purposes of ORS 260.715(9), so we consider its dictionary definition. *Webster's* defines "offer" as "to present for acceptance or rejection * * * an action or movement indicating a purpose or intention of doing something." *Webster's Third New Int'l Dictionary* 1566 (unabridged ed 1993). That definition looks only to what the

offeror's actions would objectively *indicate* to another person, not to what the offeror may subjectively intend. Similarly, *Black's Law Dictionary* 1189 (10th ed 2014) defines "offer" as

"1. The act or an instance of presenting something for acceptance; specif., a statement that one is willing to do something for another person or to give that person something *** 2. A promise to do or refrain from doing some specified thing in the future, conditioned on an act, forbearance, or return promise being given in exchange for the promise or its performance; a display of willingness to enter into a contract on specified terms, made in a way that would lead a reasonable person to understand that an acceptance, having been sought, will result in a binding contract."

Like *Webster's*, *Black's* definition of "offer" focuses on the offeror's actions and what they "would lead a reasonable person to understand," and does not reflect anything about the offeror's subjective intent. Thus, the dictionary definitions of the word are consistent with the trial court's determination that "offer," as used in ORS 260.715(9), relates to the message that the offeror has conveyed, and that it does not require the state to prove that a person charged with offering to purchase a ballot actually intended to follow through with the purchase. We conclude that the word "offer" means, in this context, a communication that would objectively be understood as proposing to engage in a described transaction.

Our review of other provisions in chapter 260 confirms that defendant's interpretation of "offer to purchase" is untenable. Defendant's proposed construction—that to "offer to purchase" means to "offer to purchase with the intent to follow through with that purchase"—essentially equates making an offer to purchase a ballot with attempting to purchase a ballot. *Cf.* ORS 161.405(1) ("A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."); *State v. Lawrence*, 231 Or App 1, 4, 217 P3d 1084 (2009) ("Offering to sell a controlled substance constitutes a substantial step toward a completed transfer of that substance."); *Black's* at 146 (defining attempt as "[a]n overt act that is done with the

intent to commit a crime but that falls short of completing the crime").[5]

The legislature has not, however, used the words "attempt" and "offer" interchangeably in ORS chapter 260. Rather, some chapter 260 statutes prohibit people from making certain kinds of offers (*e.g.*, ORS 260.558(2) (prohibiting making an "offer to sell" a signature sheet)) and others prohibit people from attempting to commit certain acts (*e.g.*, ORS 260.555(3) (prohibiting any "attempt to obtain the signature of a person to an initiative, referendum or recall petition knowing that the person * * * is not qualified to sign it")). Indeed, ORS 260.575, enacted before ORS 260.715(9), uses both terms:

> "No person, for any consideration, shall:
>
> "(1)  *Offer*, propose, threaten or *attempt* to sell, hinder or delay any part of an initiative, referendum or recall petition.
>
> "* * * * *
>
> "(3)  *Offer*, propose, *attempt* or threaten in any manner to use an initiative, referendum or recall petition or any power of promotion or opposition concerning such petition for extortion, blackmail or private intimidation of any person."

(Emphases added.) The legislature's use of both words in a single statute strongly suggests that it intended those words

---

[5] Subsection (9) of ORS 260.715 was added to the statute in 1999 (it then related to absentee ballots) and was amended in 2005 to refer to the purchase or offer to purchase "any official ballot." Or Laws 1999, ch 318, § 45; Or Laws 2005, ch 797, § 58. However, that subsection in some respects echoes earlier statutes, including a provision of the Deady Code. *See* General Laws of Oregon, Crim Code, ch 46, § 619 (Deady 1845-64) (prohibiting any person from voting or "offer[ing] to vote" in an election, knowing that the person is not entitled to vote). Accordingly, we have also considered dictionary definitions of "offer" from the mid-nineteenth century. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296 n 7, 337 P3d 768 (2014) (observing that, notwithstanding the frequency with which the Supreme Court cites modern editions of *Webster's* to determine the plain meaning of statutory terms, "[i]n consulting dictionaries, * * * it is important to use sources contemporaneous with the enactment of the statute"). However—like modern definitions—the mid-nineteenth-century definitions of "offer" which we have reviewed do not focus on the offeror's subjective intent, and those definitions therefore do not shift our understanding of the meaning of the word "offer" as used in this context.

to carry different meanings. *State v. Lang*, 273 Or App 113, 120, 359 P3d 349 (2015) ("We assume that the legislature intended each part of its enactments to have effect and that, when the legislature uses different words, it means different things.").

Finally, we observe that at least one other ORS chapter 260 provision explicitly provides that a person commits certain elections offenses only if the person acts with a particular intention. ORS 260.655(2) prohibits a person from subjecting another to "undue influence *with the intent to* induce any person to" take particular actions, like voting or refraining from voting. (Emphasis added.) The legislature's inclusion of a subjective-intent element in ORS 260.655(2)—but not in ORS 260.715(9)—further suggests that the phrase "offer to purchase * * * any official ballot" does not silently incorporate a requirement that the offeror have *intended* to purchase the ballot in question.

In sum, the trial court did not err when it rejected defendant's contention that the phrase "offer to purchase," as used in ORS 260.715(9), encompasses a requirement that the person charged with violating the statute have subjectively intended to follow through on that offer if it were accepted. The trial court correctly denied defendant's motion for judgment of acquittal to the extent it was premised on that interpretation of the statute.

B.  *The Demurrer*

To recap: in rejecting defendant's challenge to the denial of his motion, we have concluded that a person "offer[s] to purchase * * * any official ballot," for purposes of ORS 260.715(9), if the person communicates a message that objectively would be understood as proposing to purchase the right to use another person's ballot. With that understanding in mind, we turn to defendant's argument that the trial court should have granted his demurrer because the statute abridges expression in violation of Article I, section 8.

Article I, section 8, of the Oregon Constitution, provides: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall

be responsible for the abuse of this right." Under the analytical framework described in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), we determine into which of three categories the challenged statute falls.

"Under the first category, the court begins by determining whether a law is 'written in terms directed to the substance of any opinion or any subject of communication.' *Robertson*, 293 Or at 412. If it is, then the law is unconstitutional, unless the scope of the restraint is 'wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.' *Id.* If the law survives that inquiry, then the court determines whether the law focuses on forbidden effects and 'the proscribed means [of causing those effects] include speech or writing,' or whether it is 'directed only against causing the forbidden effects.' *Id.* at 417-18. If the law focuses on forbidden effects, and the proscribed means of causing those effects include expression, then the law is analyzed under the second *Robertson* category. Under that category, the court determines whether the law is overbroad, and, if so, whether it is capable of being narrowed. *Id.* If, on the other hand, the law focuses only on forbidden effects, then the law is in the third *Robertson* category, and an individual can challenge the law as applied to that individual's circumstances. *Id.* at 417."

*State v. Babson*, 355 Or 383, 391, 326 P3d 559 (2014) (some internal quotation marks omitted).

Following that analytical path, our first task is to determine whether the challenged part of ORS 260.715(9) is "written in terms directed to the substance of any 'opinion' or any 'subject' of communications," rather than to the effects of such communication. *Robertson*, 293 Or at 412.[6] Analysis under the first category of *Robertson* is focused on the statute's text. *Babson*, 355 Or at 394.

---

[6] We refer to the challenged "part" of ORS 260.715(9) because this case involves only one of several prohibitions encompassed within that statutory subsection. This opinion addresses only the meaning and constitutionality of the prohibition against making an "offer to purchase, for money or other valuable consideration, any official ballot." We express no opinion on the constitutionality of any other prohibitions contained within ORS 260.715(9) or any other provision of ORS chapter 260.

Defendant argues that, if—as we have held—ORS 260.715(9) requires the state to prove only that he made what would objectively be recognized as an "offer" to purchase a ballot (and not to also prove subjective intent to accomplish the transaction), then the statute regulates expression based on its content, not on its effect. Accordingly, defendant concludes, the statute falls within the first *Robertson* category. The state disagrees, asserting that the statute falls within the second *Robertson* category because it focuses on the "forbidden effects" of creating "public doubt in the validity of elections" and "the *appearance* that fraud exists." (Emphasis in original.)

For two reasons, we readily conclude that the statutory provision is, by its terms, directed toward the content of expression. First, as noted, we have construed the term "offer to purchase" to mean a communication that objectively conveys a proposal to purchase another person's ballot. Thus, by prohibiting the making of such an offer, the legislature has criminalized the act of communicating a certain message. Because a person can violate the pertinent part of ORS 260.715(9) *only* through expression—by communicating the prohibited message—that part of the statute appears, by its terms, to fall within the first *Robertson* category. *See State v. Moyer*, 348 Or 220, 232, 230 P3d 7 (2010) (statute prohibiting making a campaign contribution in a false name fell within the first *Robertson* category because "the falsity that the statute prohibits can only be achieved through expression—through one person's communication of a falsehood to another person").

Second, ORS 260.715(9) is not specifically directed against any harmful effects of the prohibited communication in a way that would bring the statute within the second *Robertson* category. Even assuming that the state has accurately characterized the harms that the legislature may have hoped to prevent, a person's communications can violate ORS 260.715(9) whether or not the targeted harms occur. Thus, defendant's Craigslist posting violated the statutory prohibition against offering to purchase a ballot without regard to whether, in fact, that posting created public doubt in the validity of elections or the appearance of fraud.

"Because the targeted effects are not expressed in the statute, and because * * * the targeted harm need not occur to violate the statute, the statute cannot be classified under the *Robertson* methodology as a category-two law." *Moyer*, 348 Or at 232 n 4; *see also Vannatta v. Oregon Government Ethics Comm.*, 347 Or 449, 222 P3d 1077 (2009), *cert den*, 560 US 906, 130 S Ct 3313, 176 L Ed 2d 1187 (2010) (statutes that prohibited lobbyists from "offer[ing]" certain gifts to public officials and candidates violated Article I, section 8, because they were "a type of law that focuses on the content of speaking or writing" and were "not aimed at the pursuit or accomplishment of some forbidden results," even though it would be unlawful for public officials or candidates to accept those gifts).

Because the pertinent part of ORS 260.715(9) falls within the first *Robertson* category, we must consider whether the restraint it creates is "within some well-established historical exception to free expression guarantees." *Moyer*, 348 Or at 232. The state contends that the prohibition against offering to purchase a ballot "constitutes offering to commit a crime" and, therefore, is a contemporary variant of the long-recognized historical exception for "solicitation or verbal assistance in crime." *See Robertson*, 293 Or at 412 (listing examples of historical exceptions including "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants").

To determine whether a statute falls within an established historical exception to the protections of Article I, section 8, we must consider "the initial principle that underlies the historic legal prohibition" on expression. *Moyer*, 348 Or at 237. In our view, the prohibition against making an "offer to purchase" a ballot—which does not require an intention that the transaction be completed—does not reflect the principle underlying the historical exception for solicitation and related crimes. The common-law crime of solicitation included an element of intention that the solicited crime be accomplished; it was meant to punish a person who asked another to commit a crime, intending that the other person

would act on that request. Wayne R. LaFave, 2 *Substantive Criminal Law* § 11.1 (2d ed 2003); *see also State v. Johnson*, 202 Or App 478, 484, 123 P3d 304 (2005), *rev den*, 340 Or 158 (2006) (citing LaFave, *Criminal Law* § 11.1); Charles E. Torcia, 4 *Wharton's Criminal Law* § 671 (15th ed 1993) (for a person to be guilty of common-law solicitation, it "is necessary that the defendant-solicitor 'intend' that the crime solicited be committed").[7] Phrased in *Robertson* terms, the prohibition directly targeted an easily identifiable harm— the commission of the criminal act that had been solicited— and was meant to prevent *that* harm from occurring. Thus, the goal of preventing a solicited crime from occurring is the principle underlying the common-law crime of solicitation.[8] That principle is not reflected in ORS 260.715(9) because a person can violate that statute even if he or she does not intend the proposed transaction (which would be criminal if it happened) to occur. Consequently, the pertinent part of ORS 260.715(9) is not a modern variant of the common-law crime of solicitation.

The state has not suggested any other well-established historical exception to Article I, section 8, protections that might apply to the restriction on expression

---

[7] True, we have stated—without referencing intent—that, "[a]t common law, a person was guilty of solicitation if that person requested, commanded, or importuned another to commit a felony or serious misdemeanor" and that, if "the solicited person agreed to commit the crime, each party was guilty of conspiracy." *State v. Grimes*, 85 Or App 159, 161-62, 735 P2d 1277, *rev den*, 304 Or 56 (1987). Moreover, in the context of so stating, we upheld the constitutionality of a statute that criminalized making an offer to engage in sexual conduct. *Id.* at 161. However, we did not address in that case whether the statute at issue required an actual intention to follow through with the offer to engage in sex, and it appears that we may have implicitly assumed that it did, as we described the statute as prohibiting the use of words "to further [an] illegal purpose." *Id.* at 163.

[8] The legislature included a similar intent requirement when it codified the crime of solicitation. "A person commits the crime of solicitation if with *the intent of causing another to engage in specific conduct constituting a crime* * * * the person commands or solicits such other person to engage in that conduct." ORS 161.435 (Emphasis added.) We observed in *Johnson* that the legislature chose to use the word "solicit" in that statute "because it is an historic legal term that would carry with it the traditional limitations that are intended." 202 Or App at 484 (quoting Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 57, 56 (July 1970)). We also observed that the solicitation statute had been crafted "to ensure that enforcement of the statute did not violate free speech guarantees" by, for example, specifying that a person can be guilty of solicitation only if that person intended to cause another person to engage in specific conduct constituting a crime. *Id.*

that ORS 260.715(9) imposes, and we are not aware of one.[9] Nonetheless, the state argues more broadly that "a historical exception exists authorizing the government to closely regulate the electoral system in order to ensure the accuracy and validity of its results, as well as public trust in the accuracy and validity of those results." The state's argument reduces to a contention that any election law designed to promote public trust in the state's election system must be constitutional, even though it restricts speech.[10] That argument—which implicitly urges us to approve restrictions even on the content of *political* speech—cannot withstand *Vannatta v. Keisling*, 324 Or 514, 931 P2d 770 (1997), in which the Supreme Court rejected an analogous argument offered in support of statutes restricting campaign contributions. In that case, an *amicus* had argued "that the harm targeted by the contribution limitations is the existence of undue influence in the political process, or at least the appearance thereof." *Id.* at 539. In dismissing the argument as having "select[ed] a phenomenon and label[ed] it as a 'harm,'" the court observed that,

> "if the purpose of the limitation simply is to improve the 'tone' of campaigns, as [the amicus] seems at bottom to be arguing, the constitutional answer must be even clearer: The right to speak, write, or print freely on any subject whatever cannot be limited whenever it may be said that elimination of a particular form of expression might make the electorate feel more optimistic about the integrity of the political process. A contrary result would make illusory the protections afforded by Article I, section 8."

---

[9] The parties cite to several provisions of Oregon's Deady Code in support of their contentions that mid-nineteenth century laws either did, or did not, prohibit conduct similar to that at issue here. We find those citations unhelpful, as they do not reveal whether Article I, section 8's "guarantees of freedom of expression were * * * intended to replace [those] earlier restrictions." *State v. Henry*, 302 Or 510, 521, 732 P2d 9 (1987).

[10] In conjunction with that argument, the state cites Article II, section 8, of the Oregon Constitution, which provides:

"The Legislative Assembly shall enact laws to support the privilege of free suffrage, prescribing the manner of regulating, and conducting elections, and prohibiting under adequate penalties, all undue influence therein, from power, bribery, tumult, and other improper conduct."

However, the state does not develop an argument about how that constitutional provision relates to Article I, section 8, and we do not consider it further.

*Id.* The same is true here. No matter how much one might wish to reduce cynicism about elections (and any justifications for that cynicism), the legislature cannot accomplish that goal by suppressing expression because of the "supposed harm that the message itself might be presumed to cause to the hearer or to society." *State v. Ciancanelli*, 339 Or 282, 318, 121 P3d 613 (2005). But that is exactly what the pertinent part of ORS 260.715(9) does.

In sum, the statutory prohibition on making an "offer to purchase" a ballot, contained in ORS 260.715(9), violates Article I, section 8, of the Oregon Constitution. The trial court erred when it denied defendant's demurrer to the information, which charged him with violating that statute.

Reversed and remanded.